JUDGE J. JONES, concurring in part and dissenting in part.
¶ 45 I concur in the majority's conclusions that the court erred in allowing evidence of the 2010 Kansas incident under CRE 404(b) and that any errors in allowing the prosecutor to refresh a witness's recollection without using a writing and in instructing the jurors that "[a]n officer may pursue a fleeing suspect even in to that person's home" don't require reversal under the applicable standards of review. I respectfully dissent, however, from the rest of the majority's conclusions.
• I disagree with the majority's decision to allow defendant to further pursue his motion to suppress on remand. He failed to preserve for our review the only issue he raises relating to that motion, and that should be the end of the matter.
• I also disagree with the majority's conclusion that the court's error in allowing evidence of the 2010 Kansas incident under CRE 404(b) likely requires reversal. In my view, that error was harmless because the evidence that defendant menaced the police officers was overwhelming.
• I disagree with the majority's conclusion that the district court reversibly erred in denying defendant's motion for a continuance to locate a witness. Given defendant's lack of diligence, the lateness of the motion, and defendant's failure to show that he could find the witness within a reasonable time, the district court acted well within its discretion.
• Lastly, I disagree with the majority's conclusion that reversal is required for cumulative error. The three errors (or potential errors) the district court may have made didn't deprive defendant of a fair trial.
¶ 46 I also address two claims of evidentiary error that the majority doesn't address. I do so because the issues are likely to arise on remand. Neither claim is persuasive.
¶ 47 I would affirm the judgment.
I. The Motion to Suppress
¶ 48 On appeal, defendant argues that the district court should have suppressed evidence obtained by the police officers after they entered the "curtilage" of his residence because they needed a warrant to enter that area and didn't have one. The majority concludes in a footnote that defendant preserved that argument, but because the district court didn't rule on it, defendant should be allowed to pursue it on remand. The majority errs, for two reasons.
¶ 49 First, defendant manifestly did not preserve the argument. His motion to suppress raised only one issue: should the evidence obtained by the police be suppressed because their conduct was outrageous? That theory is different from the theory that evidence obtained by reason of a warrantless search must be suppressed. The outrageous government conduct theory is based on the Due Process Clause of the Fifth Amendment, see United States v. Russell , 411 U.S. 423, 431-32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (cited in defendant's motion); People in Interest of M.N. , 761 P.2d 1124, 1127 (Colo. 1988), while the stand-alone warrantless search theory is based on the Fourth Amendment, see People v. Brunsting , 2013 CO 55, ¶¶ 16-21, 307 P.3d 1073.
¶ 50 That defendant didn't raise a stand-alone Fourth Amendment argument, but instead relied solely on a Fifth Amendment due process argument, is borne out by the following aspects of the motion:
• The motion is captioned "MOTION TO DISMISS OR IN THE ALTERNATIVE TO SUPPRESS EVIDENCE OBTAINED BY OUTRAGEOUS GOVERNMENT CONDUCT."
• The motion alleged facts related to officer conduct that would've been irrelevant to a warrantless entry argument; these facts were obviously included to *892 show that the officers overreacted and used excessive force.
• Though the motion asserted in conclusory fashion that the officers "disregarded the protections of the Fourth Amendment," it said the officers disregarded those protections "when [they] committed outrageous conduct by illegally trespassing."
• The legal analysis portion of the motion focused on the Due Process Clause. And the motion expressly urged the court to address the issue as one of outrageous government conduct. ("For purposes of evaluating a claim of outrageous government conduct....")
• The motion argued that "the government's actions were fundamentally unfair and a shock to the universal sense of justice." That is an outrageous government conduct argument, not a Fourth Amendment argument. See Russell , 411 U.S. at 431-32, 93 S.Ct. 1637 ; People in Interest of M.N. , 761 P.2d at 1127.
• The motion argued that "[i]t is implicit in this Court's authority to determine whether violations of the Due Process Clause of the Fifth Amendment warrant dismissal of criminal charges."
• The motion argued that the officers' entry on defendant's patio (the "curtilage" of his residence) was "an act of criminal trespass," and that "the trespass ... was wholly unreasonable."
• The motion argued that "[h]ad [the police] not trespassed, there would have been no escalation, no armored vehicle [would have] crashed through the property, and a twenty-three year-old young man would not have been shot. Instead, the officers invaded [defendant's] home, guns drawn, with absolutely no legal justification whatsoever."
• And lastly, the motion concluded as follows: "Because the officers committed outrageous conduct by illegally entering [defendant's] property in violation of his due process rights under the Fifth Amendment and the requirements of the Fourth Amendment," the charges should be dismissed or the evidence should be excluded.
¶ 51 Based on the content of the motion, the district court, understandably and correctly, viewed it as one based on outrageous government conduct. To be sure, the motion contains a couple of references to the Fourth Amendment and the lack of a warrant. But read in context, those references were made in service of the outrageous government conduct argument.[1]
¶ 52 Defense counsel's silence following the court's ruling also speaks volumes. After the court ruled that "[n]one of the alleged facts rise to the level of outrageous government conduct," they said nothing more about the motion. In fact, at a pretrial conference, the court, after noting that it had a month earlier denied the motion asserting outrageous government conduct, asked defense counsel whether it had missed "any motions or outstanding issues." One of defendant's attorneys responded, "I don't believe so, Your Honor." Had defense counsel believed that the court had overlooked an argument, they surely would've brought that to the court's attention, especially since the court expressly invited them to do so. Indeed, counsel's statement that the court hadn't overlooked any issues arguably constituted a waiver of the issue defendant now raises on appeal.[2]
¶ 53 It's obvious to me why defendant's highly experienced trial attorneys[3] didn't raise a stand-alone Fourth Amendment argument in the motion. Any such argument would've run headlong into People v. Doke , 171 P.3d 237 (Colo. 2007). In Doke , which *893 involved facts remarkably similar to those in this case, the supreme court held that "where a defendant responds to an alleged Fourth Amendment violation with a physical attack or threat of attack upon the officer making the illegal arrest or search, ... evidence of this new crime is admissible." Id. at 239 ; see id. at 240 (the defendant's menacing of the officer with a gun "dissipated the taint of the prior illegality"); see also People v. Brown , 217 P.3d 1252, 1257 (Colo. 2009) ("A defendant may not respond to an unreasonable search or seizure by a threat of violence against the officer and then rely on the exclusionary rule to suppress evidence pertaining to that criminal act." (citing Doke , 171 P.3d at 239 )).
¶ 54 Because defendant didn't raise his stand-alone Fourth Amendment argument in his motion, he waived it. People v. Samuels , 228 P.3d 229, 238 (Colo. App. 2009) ; People v. Salyer , 80 P.3d 831, 835 (Colo. App. 2003) ; see People v. Gouker , 665 P.2d 113, 117-18 (Colo. 1983) (a defendant may not raise new suppression theories on appeal after those he raised in the district court proved unsuccessful).
¶ 55 Second, to the extent a stand-alone Fourth Amendment argument is buried in the motion, defendant abandoned it. When a party raises an issue in the district court, but the court doesn't rule on it, the defendant must ask the district court to rule on it to preserve it for appeal. If the defendant doesn't do that, we deem the issue abandoned and won't address it. E.g. , Vanderpool v. Loftness , 2012 COA 115, ¶¶ 26-28, 300 P.3d 953 (citing numerous cases); People v.Tallwhiteman , 124 P.3d 827, 834 (Colo. App. 2005) ; People v. Ridenour , 878 P.2d 23, 28 (Colo. App. 1994).
¶ 56 The majority believes defendant raised the argument but that the district court didn't rule on it. If that is so, we should, consistent with the long-standing rule noted above, deem the argument abandoned, not remand for a ruling. The majority doesn't explain why it declines to apply this fundamental rule of issue preservation.
¶ 57 For these reasons, I would refuse to address defendant's argument and wouldn't remand for additional consideration by the district court.
II. Evidentiary Issues
A. Refreshing Recollection
¶ 58 Defendant argues that the prosecutor's question to a bystander witness, "And if you told the officer at that time that you heard 'stop police,' would that be accurate," was leading and an improper attempt to refresh recollection. The majority agrees with defendant on both scores.
¶ 59 I do not agree with the majority that the question was leading. A leading question is one that suggests its own answer. See 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 6:65, at 427 (4th ed. 2013). This question didn't do that. It was conditional-that is, the answer turned on "if" the witness had said something to the officer, a fact the witness was free to deny if inconsistent with her recollection.
¶ 60 I do agree with the majority that the question was likely an improper attempt to refresh recollection because the prosecutor didn't try to comply with the requirements of CRE 612. I note, however, that defense counsel didn't raise this objection at trial.
¶ 61 In any event, the majority correctly concludes that any error was harmless. In my view, the error was completely harmless because defense counsel was able to establish on cross-examination that the officer's report of his conversation with the witness said the witness told him she had heard an officer yell "stop"; he didn't report that she had told him she heard the officer yell "stop, police."
B. The 2010 Kansas Incident
¶ 62 I fully agree with the majority's determination that the district court erred by allowing evidence about the 2010 Kansas incident under CRE 404(b).[4] But I disagree with the majority that the error requires reversal. The key issue at trial was whether defendant knew he was being pursued by police officers. Having reviewed the trial transcript, I conclude that the properly admitted evidence overwhelmingly showed he knew that he was *894 being pursued by police officers and that they were just outside his residence when he menaced them with a gun. Therefore, the error was ultimately harmless. See Russell v. People , 2017 CO 3, ¶¶ 5-7, 387 P.3d 750 ; People v. Workman , 885 P.2d 298, 300-01 (Colo. App. 1994) ; People v. Groves , 854 P.2d 1310, 1315 (Colo. App. 1992).
C. The Re-Creation of the Police Knock
¶ 63 Defendant also contends that the district court erred in allowing an investigator to testify about his "experiment" to determine whether defendant would've heard an officer knock on his door. (Two of the officers had testified that they knocked on the door several times and identified themselves as police; a neighbor had testified she didn't hear any knocking.) According to defendant, that testimony was expert testimony that the court shouldn't have allowed because the prosecution didn't try to establish that the investigator was an expert. See CRE 703. And, defendant adds, the investigator's testimony wasn't reliable because the conditions at the time of the experiment were different from those at the time of the incident.
¶ 64 The majority doesn't address defendant's arguments regarding this evidence even though it is highly likely that the prosecution will again try to introduce the evidence on retrial. But our common practice is to address contentions that pertain to issues likely to arise on remand. E.g. , Venalonzo v. People , 2017 CO 9, ¶ 2 n.2, 388 P.3d 868 ; People v. Serra , 2015 COA 130, ¶ 59, 361 P.3d 1122 (evidentiary issues); People v. Marciano , 2014 COA 92M-2, ¶ 19, 411 P.3d 831 (evidentiary issues); People v. Jefferson , 2014 COA 77M, ¶ 39, 411 P.3d 823 (expert testimony), aff'd , 2017 CO 35, 393 P.3d 493. I think the interest in judicial efficiency demands that we do so.
¶ 65 I see no abuse of discretion. See People v. Ramos , 2017 CO 6, ¶ 5, 388 P.3d 888 (we review a district court's ruling on whether testimony constitutes expert testimony for an abuse of discretion). Expert testimony is that which couldn't be offered without specialized experiences, knowledge, or training: testimony that is based on an ordinary person's experiences and knowledge is not expert testimony. Venalonzo , ¶¶ 2, 16.
¶ 66 The investigator's testimony wasn't based on specialized experiences, knowledge, or training. Only an ordinary person's sense of hearing was necessary to determine whether a knock on defendant's door could be heard from inside defendant's residence.[5]
¶ 67 Though defendant argues that the conditions at the time of the experiment were different from those at the time of the incident, the differences on which he relies go to the weight of the testimony, not its admissibility.
D. Police Actions After the Incident
¶ 68 Defendant also contends the district court erred in disallowing evidence of police conduct after the incident, photographs showing damage to defendant's residence, and a photograph showing where certain shell casings were found. The majority doesn't address this issue though it is likely to arise on remand.
¶ 69 Again, I see no abuse of discretion. Though defendant argues that the evidence was admissible as res gestae and to impeach unspecified testimony, I see no relevance in the evidence. The evidence is not necessary to give the jury an accurate and complete picture of the incident-the purpose of res gestae evidence, see People v. Greenlee , 200 P.3d 363, 368 (Colo. 2009) -nor does it tend to undermine any of the officers' testimony. It appears instead that defendant wanted to use much of the evidence to show that the officers overreacted after the incident; that is, he wanted to cast the officers in a bad light. That had nothing to do with any fact of consequence in the case. And any marginal relevance was substantially outweighed by the danger of creating a time-wasting sideshow. See CRE 403.
III. The Erroneous Jury Instruction
¶ 70 Though I agree with the majority's disposition of this issue, I think defendant's contention warrants a bit more discussion.
*895 ¶ 71 Instructing the jurors that "[a]n officer may pursue a fleeing suspect even to that person's home" was error. But it was not, contrary to defendant's argument, constitutional error. "Only those errors 'that specifically and directly offend a defendant's constitutional rights are "constitutional" in nature.' " People v. Flockhart , 2013 CO 42, ¶ 20, 304 P.3d 227 (quoting Wend v. People , 235 P.3d 1089, 1097 (Colo. 2010) ). The error in giving the instruction didn't do that. So we review this garden-variety instructional error for harmless error. See, e.g. , People v. Garcia , 28 P.3d 340, 344 (Colo. 2001) ; People v. Chirico , 2012 COA 16, ¶ 7, 272 P.3d 1170.
¶ 72 Under the harmless error test, we will disregard any error that doesn't affect a defendant's substantial rights. Crim. P. 52(a). The defendant has the burden of showing that the asserted error wasn't harmless. People v. Vigil , 718 P.2d 496, 500 (Colo. 1986) ; People v. Casias , 2012 COA 117, ¶ 60, 312 P.3d 208.
¶ 73 Defendant's entire argument on the jury instruction comprises nine lines of his opening brief, and it doesn't include any assertion, much less explanation, of prejudice.[6] Thus, he has failed to carry his burden.
IV. Denial of a Continuance
¶ 74 One week before trial, defendant moved for a continuance to subpoena the cab driver. By way of background, the motion said the defense had begun attempting to locate and subpoena the cab driver less than two months before trial, and that their efforts had been unsuccessful. The motion also noted that neither the defense nor the prosecution had a current address for the cab driver (the last known address was in Florida), and that the prosecution had not served the cab driver with a subpoena. The motion did not request any particular length of a continuance. The court denied it.
¶ 75 Defense counsel renewed the motion the first day of trial, but they presented no new information on the cab driver's whereabouts. The prosecutor objected, noting that "it wasn't just last week that counsel became aware that [the cab driver] was no longer in the state," and that he had given a Florida address to defense counsel in mid-January after defense counsel had contacted him to see if the prosecution knew where the cab driver was. The prosecutor also said that the prosecution had tried unsuccessfully to subpoena the cab driver. The court again denied the motion, primarily because the cab driver's testimony would be of marginal relevance. But the court also observed that the defense had known of the cab driver's identity for a long time and could've subpoenaed him any time after the trial date had been set. When defense counsel renewed the motion the next day, the court denied it "based on the court's prior rulings."
¶ 76 Under the circumstances presented, the district court didn't abuse its discretion. See People in Interest of D.J.P. , 785 P.2d 129, 131 (Colo. 1990) ("A continuance is a matter within the discretion of the trial court....").
¶ 77 Defense counsel knew of the cab driver's role in the incident from the get-go but, by their own admission, made no effort to find him until less than two months before trial. Id. at 131-32 ("Where a request for a continuance is grounded on the absence of a witness, it is not an abuse of discretion to deny the continuance if the party seeking the continuance failed to use due diligence to procure the presence of that witness. The burden is on the party requesting the continuance to show that due diligence was used.") (citations omitted). And, though both the defense and the prosecution had tried to locate and serve the cab driver, those efforts had been fruitless. See People v. Bustos , 725 P.2d 1174, 1178 (Colo. App. 1986) (where "extensive but fruitless efforts" had been made to find a witness, the court did not abuse its discretion in denying a defense motion to continue on the first day of trial). Indeed, no one knew where the cab driver was, so it was utterly speculative that the defense would be able to locate and serve him within a reasonable time. See People v. Marsh, 396 P.3d 1, 14 (Colo. App. 2011) (affirming denial of defense request for a continuance in part because the defendant didn't show a reasonable probability that the witness would ever be available to testify), aff'd on other grounds , *896 2017 CO 10M, 389 P.3d 100 ; People v. Staten , 746 P.2d 1362, 1364 (Colo. App. 1987) (affirming denial of defense request for a continuance in part because defense efforts to locate the witness had not been fruitful).
¶ 78 In light of these facts, the district court's decision was neither arbitrary nor unreasonable nor unfair.
V. Cumulative Error
¶ 79 The question in deciding whether multiple errors, none of which individually requires reversal, nonetheless dictate that the defendant receive a new trial is whether the cumulative effect of the errors shows that the defendant didn't receive a fair trial. See People v. Roy , 723 P.2d 1345, 1349 (Colo. 1986) ; Oaks v. People , 150 Colo. 64, 66-67, 371 P.2d 443, 446 (1962) ; People v. Munsey , 232 P.3d 113, 124 (Colo. App. 2009). We must keep in mind that a defendant, though entitled to a fair trial, is not entitled to a perfect trial. Roy , 723 P.2d at 1349 ; see Bruton v. United States , 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ; Flockhart , ¶ 36.
¶ 80 A number of factors are relevant to deciding whether a new trial is warranted for cumulative error. These include "the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy of any remedial efforts); the strength of the government's case; and the length of the trial." People v. Howard-Walker , 2017 COA 81M, ¶ 114, --- P.3d ----.
¶ 81 I see only three errors-the improper attempt to refresh a witness's recollection, the admission of evidence about the 2010 Kansas incident, and the instruction on the police's right to enter a person's property. For the reasons discussed above, I believe only the second of these errors (evidence of the 2010 Kansas incident) was potentially prejudicial; the other two had no prejudicial effect at all. Given that I also view the evidence of defendant's guilt as overwhelming, I conclude that the cumulative effect of these errors didn't deprive defendant of a fair trial.
VI. Conclusion
¶ 82 In sum, though I agree with the majority on a few points, I disagree on several others. Most importantly, I see no basis for reversing the convictions and therefore would affirm the judgment.
APPENDIX 1
*897 DISTRICT COURT, BOULDER COUNTY, COLORADO 1777 6th Street Boulder, CO 80302 PLAINTIFF: THE PEOPLE OF THE STATE OF COLORADO DEFENDANT: COLEMAN STEWART Pamela Robillard Mackey, #15136 David S. Kaplan. #12344 HADDON, MORGAN AND FOREMAN, P.C. 150 East 10th Avenue ? COURT USE ONLY ? Denver, CO 80203 Phone: 303.831.7364 Case No. 14 CR 884 Fax: 303.832.2628 E-mail: pmackey@hmflaw.com;dkaplan@hmflaw.com Attorneys for Defendant MOTION TO DISMISS OR IN THE ALTERNATIVE SUPPRESS EVIDENCE OBTAINED BY OUTRAGEOUS GOVERNMENT CONDUCT
Coleman Stewart, through his undersigned counsel, hereby moves for dismissal of the charges against him, or in the alternative for an order suppressing all evidence obtained pursuant to the government's illegal entry into his property in violation of his rights under the Fourth and Fifth Amendments. As grounds therefor, Mr. Stewart states as follows:
I. RELEVANT FACTS
The police reports and other discovery provided to the defense by the prosecution support the following recitation of facts:
In the early morning hours of May 30, 2014, Coleman Stewart was in a cab after an evening of socializing with friends. The cab was taking Mr. Stewart from Conor O'Neills located at 1922 13th St. in Boulder, to his home at 1090 11th Street in Boulder, approximately one mile away. As the cab approached the intersection near his home, a dispute arose regarding payment of the $4.85 fare and the cab driver increased his speed to prevent Mr. Stewart from exiting the cab. Mr. Stewart then fled the cab and began running toward his home. The cab driver alerted a nearby Boulder Police officer and both men began to chase Mr. Stewart to his home. The men were prevented front proceeding further, as the residence is enclosed by a privacy fence with a locked gate.
None of the alleged facts rise to the level as outrageous government conduct DENIED. P. Butler 12/18/14.
*898 Additional Boulder Police officers arrived to provide assistance. At least one officer attempted to climb the fence and in the process opened the locked gate. Four officers proceeded into the enclosed patio area of Mr. Stewart's residence, took position around the door and windows of the apartment and shortly thereafter fired a total of ten rounds into Mr. Stewart's apartment, believing they had seen a firearm through the blinds. Mr. Stewart sustained two gunshot wounds and retreated into his apartment, where he remained for nearly two hours. Mr. Stewart was ultimately removed from his home by the Boulder SWAT team, which drove an armored vehicle through the fence and kicked in his front door.
The law enforcement response included no fewer than eight law enforcement agencies and units, and approximately eighty individual investigators. Mr. Stewart is charged with four counts of felony menacing, one count of resisting arrest, one count of obstructing a peace officer, and one petty offense count of theft.
II. ARGUMENT
Law enforcement violated Mr. Stewart's due process rights under the Fifth Amendment and disregarded the protections of the Fourth Amendment when it committed outrageous conduct by illegally trespassing into Mr. Stewart's home. As a result, the charges against him should be dismissed, or in the alternative, any evidence flowing from their illegal actions should be suppressed.
The Fifth Amendment protects individuals from deprivation of life, liberty. or property, without due process of law. U.S. Const. amend. V. The Fourth Amendment was intended to protect people against unreasonable intrusions by the government by permitting particularized searches only upon a showing of probable cause. U.S. Const. amend. IV. The Supreme Court has recognized that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."Kentucky v. King, 131 S.Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011) (quotingPayton, supra, at 590) (internal quotation marks omitted).
It is implicit in this Court's authority to determine whether violations of the Due Process Clause of the Fifth Amendment warrant dismissal of criminal charges. Further. violations of the Fourth Amendment should result in exclusion of any evidence flowing therefrom.Mapp v. Ohio, 367 U.S. 643 (1961):Wong Sun v. United States, 371 U.S. 471, 487-488 (1963). For purposes of evaluating a claim of outrageous government conduct, a defendant must show a violation of his constitutional due process rights by the actions of government officials to such a degree as to defy fundamental fairness and shock the universal sense of justice.United States v. Russell. 411 U.S. 426 (1973) (internal quotations omitted). The body of law regarding outrageous government conduct *899 is neither illustrative nor helpful in this instance, as the factual basis of this case is greatly distinguishable.
Here. Boulder Police officers committed an illegal trespass when they climbed a privacy fence for purposes of circumventing a locked gate and entered an area of the curtilage of Mr. Stewart's home. They made this illegal entry based solely upon the suspicion that Mr. Stewart had failed to pay a $4.85 cab fare. Upon entry into his property. officers shot and seriously injured Mr. Stewart inside his home based upon the mistaken belief that he possessed a deadly weapon. This intrusion was not justified by exigent circumstances, nor did the officers seek a warrant as required by the Fourth Amendment. As such, the actions of the government violated Mr. Stewart's right to have a search of his home evaluated by a neutral judicial officer prior to entry by law enforcement, as required by the Fourth and Fifth Amendments.
In the totality of the circumstances, and considering the violent outcome of this intrusion, the government's actions were fundamentally unfair and a shock to the universal sense of justice. As such, the charges against Mr. Stewart should be dismissed, or in the alternative, any evidence obtained pursuant to the officers' illegal trespass, including their observations, must be suppressed.
A. Mr. Stewart's patio is a protected extension of his dwelling.
Law enforcement trespassed into the curtilage of Mr. Stewart's home. It is well-established that the curtilage surrounding a dwelling is protected as an extension of that dwelling under certain circumstances. Four factors have been identified by the Supreme Court for consideration in defining the extent of a home's curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."Hoffman v. People, 780 P.2d 471, 475 (Colo. 1989) (quotingUnited Slates v. Dunn, 480 U.S. 294, 301, (1987)).
Mr. Stewart's patio falls squarely within all categories and, as such, is an extension of his dwelling. The patio immediately surrounds the front door and windows of Mr. Stewart's home. The patio is also enclosed by a tall privacy fence with a locking gate. It is private to Mr. Stewart's residence and is not accessible by other residents of Mr. Stewart's building. While Mr. Stewart resided there, the patio was used as a place of relaxation and recreation within an area private to the general public. It was also an area where he stored personal items, such as a patio table and chairs and a dirt bike, and thus he had taken measures to protect his belongings and privacy by employing a locking gate.
*900 Having established that the patio constitutes the curtilage of Mr. Stewart's home, and thus a constitutionally protected area, we look to the officers' entry into that area and find that the officers committed an act of criminal trespass.
B. Law enforcement committed an illegal trespass.
It is undisputed that Officer Frankenreiter, the officer who first followed Mr. Stewart to his home, encountered Mr. Stewart's locked gate and stopped, presumably because he knew it would he illegal to proceed further. Unlike Officer Frankenreiter, Officers Perea and Stark - based solely upon the suspicion that Mr. Stewart had failed to pay a $4.85 cab fare - proceeded to climb the fence and open the locked gate, thus allowing the remaining officers to enter the premises.
Colorado law provides that second degree criminal trespass occurs when a person "[u]nlawfully enters or remains in or upon the premises of another which are enclosed in a manner designed to exclude intruders or are fenced[.]" C.R.S. § 18-4-503(1)(a). Importantly, law enforcement officers are not excluded from charges of criminal trespass, even when carrying out an arrest. InPeople v. Lutz, the Court of Appeals held that a statute abrogating the right to resist an unlawful arrest did not apply where the forcible resistance to law enforcement officers, which formed the basis of charged conduct, was to prevent an unlawful entry by trespassers who happened to be police officers. 762 P.2d 715 (Colo, App. 1988). The court went on to acknowledge the applicability of Colorado's defense of premises statute to "unlawful entries where the trespassers happen to be police officers," even where the officers may have probable cause, but not a warrant, for an arrest. 762 P.2d at 717, 716 (citingPayton v. New York, 445 U.S. 573, (1980) (Fourth Amendment prohibits police, even with probable cause for arrest, to make warrantless entry into home for that purpose)).
At a minimum. Mr. Stewart's patio was a fenced premises designed to exclude intruders and an area subject to second degree trespass. Absent exigent circumstances, which will be discussed below, the officers had no legal basis for climbing the fence or jostling open a gate they knew was locked so that they could gain access to Mr. Stewart's property. Further, these officers surely knew that their entry was unlawful. Indeed, to carry out their duties, society entrusts that officers are well-informed and trained regarding the laws they are charged with enforcing. Thus, these officers committed a knowingly unlawful trespass absent a good faith basis for entry.
C. There were no exigent circumstances to justify warrantless entry.
No exigent circumstances existed sufficient to provide law enforcement with a reasonable basis for entering the property without a warrant. The law prescribes certain *901 circumstances that justify law enforcement intrusions unsanctioned by a warrant. These exigent circumstances include the need to prevent destruction of evidence, pursuit of a fleeing suspect, and to render emergency aid. "[T]he fundamental measure of the existence of exigent circumstances is an assessment of reasonableness based on the totality of the circumstances."People v. Brunsting, 307 P.3d 1073, 1080 (Colo. 2013).
Additionally, the gravity of the offense is important to consider when determining whether exigent circumstances exist sufficient to justify warrantless entry into one's home. InWelsh v. Wisconsin, the Court held that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense ... has been committed." 466 U.S. 740, 753 (1984). The Court found it "difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor."Id.
In the totality of the circumstances, the trespass by police into Mr. Stewart's home was wholly unreasonable. It is critical to bear in mind that at the time the police reached Mr. Stewart's fence, the only suspicion of criminal activity they had was that he had failed to pay a $4.85 cab fare. Officer Frankenreiter heard screeching tires and saw Mr. Stewart jumping out of a cab. He asked the cab driver whether Mr. Stewart had paid and when the cab driver said no, he chased Mr. Stewart into his home. He had absolutely no reason to believe that Mr. Stewart presented any danger whatsoever. He had no reason to believe that evidence of unpaid cab fare was at risk of being destroyed. He had no reason to believe that emergency aid was necessary. UnderWelsh, suspicion of a petty offense does not support a finding of exigent circumstances sufficient to justify warrantless intrusion into Mr. Stewart's home.
All of the dramatic events that transpired resulted from the officers' unlawful entry into Mr. Stewart's home. Had they not trespassed, there would have been no escalation, no armored vehicle crashed through the property, and a twenty-three year-old young man would not have been shot. Instead, the officers invaded Mr. Stewart's home, guns drawn, with absolutely no legal justification whatsoever.
V. CONCLUSION
Because the officers committed outrageous conduct by illegally entering Mr. Stewart's property in violation of his due process rights under the Fifth Amendment and the requirements of the Fourth Amendment, the charges against him should be dismissed. In the alternative, all evidence obtained subsequent to government's illegal entry, including the officers' observations, should be excluded.
*902 Dated: December 17, 2014. Respectfully submitted, Pamela Robillard Mackey, #15136 David S. Kaplan, #12344 HADDON, MORGAN AND FOREMAN. P.C. 150 East 10th Avenue Denver, CO 80203 Phone: 303.831.7364 Fax: 303.832.2628 Attorneys for Defendant
Certificate of Service
I certify that on December 17, 2014, a copy of the foregoing MOTION TO DISMISS OR IN TOTE ALTERNATIVE SUPPRESS EVIDENCE OBTAINED BY OUTRAGEOUS GOVERNMENT CONDUCT was servedvia email upon the following:
Adrian VanNice. Esq. Office of the District Attorney 1777 6th Street Boulder, CO 80306 Phone: 303.441.3700 Fax: 303.441.4703 avannice@bouldercounty.org Stephanie Howard

Defendant's motion is attached hereto as Appendix 1.

The record also shows that defense counsel filed an extensive Fourth Amendment motion to suppress evidence obtained from defendant's home, but limited the argument to the validity of search warrants the police obtained after the incident. The motion didn't assert that evidence obtained at the time of the incident should be suppressed.

Defendant's attorneys at trial, both of whom put their names on the motion, were Pamela Mackey and David Kaplan, a former State Public Defender. A different attorney represents defendant on appeal.

The People's argument that the evidence was not subject to CRE 404(b) is specious.

Defendant's contention that the investigator's statement that the person whom he had knock on the door made a "cop knock" rendered the investigator's testimony expert testimony is meritless. The investigator explained that the person doing the knocking knocked with varying degrees of loudness and that a "cop knock" was a term he used to refer to a medium knock.

At oral argument, defense counsel said the prejudice was that the instruction "placed a thumb on the scale." Not only was this explanation too late, it was too vague.